**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Larry J. Verhulst,<br><br>        Plaintiff,<br><br>vs.<br><br>General American Life Insurance Company; The Paul Revere Life Insurance Company; UNUM/Provident Corporation; and Provident Life and Accident Insurance Company,<br><br>        Defendants. | No. CV-03-0858-PCT-JAT<br><br>**ORDER** |

Pending before the Court is Defendants' Motion for partial summary judgment (Doc. #77).

**FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiff, an orthopedic surgeon, has a disability insurance policy with Defendants. The policy includes coverage for both a partial disability (with proportional benefits) and a total disability (with full benefits). Plaintiff became totally disabled due, at least initially, to depression.[1] Plaintiff applied for and received full benefits under the policy through April 12, 2001. On April 12, 2001, Defendants decided Plaintiff was no longer disabled and

---

[1] Plaintiff also suffered from a chronic neck condition, which later resulted in Plaintiff having to have surgery. This condition was treated by Dr. Barranco.

terminated his benefits. Plaintiff brought this lawsuit arguing that he was disabled well after April 12, 2001, that he continues to be disabled through today, and that he is entitled to benefits under the policy for that entire period of time. Thus, Plaintiff argues that Defendants breached the disability insurance contract by failing to continue to pay disability benefits after April 12, 2001.

Defendants admit that there is a question of fact for trial on the issue of whether they breached the contract in failing to pay benefits for the period of April 12, 2001 through May 23, 2001. Defendants then argue that they are entitled to summary judgment that as of May 23, 2001, Plaintiff was no longer disabled. Defendants also argue that Plaintiff has no evidence to support his claims of bad faith and punitive damages. Plaintiff disagrees.

**DISCUSSION**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, summary judgment is mandated, "...against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of pointing out to the Court the basis for the motion and the elements of the causes of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Id.* at 323. The burden then shifts to the non-movant to establish the existence of material fact. *Id.* The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-movant's bare assertions, standing alone, are insufficient to create

a material issue of fact and defeat a motion for summary judgment. *Id.* at 247-48. However, in the summary judgment context, the Court construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

### BREACH OF CONTRACT

The issue on summary judgment is whether Plaintiff has presented sufficient evidence to create a question of fact for trial that he was disabled as a May 23, 2001 and thereafter. Plaintiff offers the following to show he was disabled.

First, Plaintiff offers that his treating doctor, Dr. Cornelius, has opined that Plaintiff continued to be disable to and after May 2001. Dr. Cornelius believed that Plaintiff could "try" working again, envisioning that Plaintiff could gradually resume his practice to determine how work affected his condition. Dr. Cornelius' envisioned "trial" may have been limited to Plaintiff being an assistant surgeon, rather than the primary surgeon.

Second, Plaintiff offers that he could not return to work, even on the trial basis, because the Arizona Board of Medical Examiners was conducting an investigation into whether Plaintiff could practice medicine, considering Plaintiff's condition (which Dr. Cornelius had reported Plaintiff to the Arizona Board of Medical Examiners). In June of 2001, Plaintiff requested that his license be put on inactive status rather than continue with the investigation. As of October 1, 2002, the Arizona Board of Medical Examiners had declined to reinstate Plaintiff's license.

Third, Plaintiff offers evidence that Dr. Barranco has certified that due to Plaintiff's numbness in his hand, he was disabled from working as a surgeon. Further, Plaintiff offers that this condition ultimately led to surgery.

Defendants reply that none of this evidence creates an issue of fact. First, Defendants argue that because Dr. Cornelius said Plaintiff could try working, it proves Plaintiff was not disabled. Plaintiff counters that the purpose of this trial was to see if Plaintiff could work even with his condition, the trial was not proof that Plaintiff could work. Alternatively, Plaintiff argues that even if the trial had gone forward, Plaintiff would still be entitled to

- 3 -

1  partial disability benefits.[2] The Court agrees with Plaintiff that the meaning of Dr. Cornelius'
2  trial period is a question of fact for trial.

3  Next, Defendants argue that the fact that Plaintiff could not get his license reinstated
4  does not show that he was disabled. Defendants base this argument on the fact that the
5  standard the Arizona Board of Medical Examiners applies to being qualified to practice
6  medicine is not the same standard for being totally disabled under the policy. While this may
7  be true, the Court still finds the fact that Plaintiff was precluded from practicing by the
8  Arizona Board of Medical Examiners to be supportive of Plaintiff's argument that there is
9  a question of fact as to whether he was totally disabled.

10  Finally, Defendants argue that Plaintiff was not "under a physician's regular care" for
11  his neck pain; therefore, it can not form the basis for his disability claim. While this may be
12  true for some period of Plaintiff's claimed disability, again the Court finds that the fact that
13  Plaintiff had surgery for the condition to be evidence supporting Plaintiff's argument that
14  there is a question of fact as to whether Plaintiff was disabled from working for some period
15  of time after May of 2001.

16  As a result of the forgoing, Defendants' Motion for Partial Summary Judgment on
17  Plaintiff's breach of contract claim (for the period after May 23, 2001) will be denied.

## BAD FAITH

19  Next, Defendants argue that they acted reasonably in terminating benefits on
20  Plaintiff's claim; therefore, they are entitled to summary judgment on Plaintiff's bad faith
21  claim. Generally, under Arizona law, for a plaintiff to show that an insurance company acted
22  in bad faith, the plaintiff must show the absence of a reasonable basis for denying benefits

---

[2] Defendants reply that because Plaintiff never actually went forward with part-time or trial work, Plaintiff is not entitled to partial disability benefits under the policy. To summarize, Defendants appear to argue that because Plaintiff could do part-time work, Plaintiff is not entitled to full disability benefits. Then, Defendants argue that because Plaintiff did not actually do any part-time work (which Plaintiff claims was because he was fully disabled), Plaintiff also cannot receive proportional benefits. At a minimum, the Court does not find this argument persuasive.

- 4 -

and that the insurance company either knew or recklessly disregarded the fact that it did not have a reasonable basis for denying benefits. *Noble v. National Am. Life Ins. Co.,* 624 P.2d 866, 868 (Ariz. 1981).

The first prong of the test for bad faith is an objective test based on reasonableness. *Trus Joist Corp. v. Safeco. Ins. Co.*, 735 P.2d 125, 134 (Ariz. App. 1986). Thus, if the actions taken on the part of the insurance company were reasonable, the insurance company will not be found to have acted in bad faith. *Id.* In determining whether the insurance company acted reasonably in a case premised on failure to pay benefits, the Court considers whether the insurer's liability under the policy was "fairly debatable." *See Deese v. State Farm Mut. Auto. Ins. Co.,* 838 P.2d 1265, 1268 (Ariz. 1992). Thus, under the first prong, (in first-party bad faith actions) Defendants can challenge claims that are fairly debatable without having acted in bad faith. *See Clearwater v. State Farm Mut. Auto. Ins. Co.*, 792 P.2d 719, 723 (Ariz. 1990).

If Plaintiff can show that the first prong is met, then Plaintiff must also be able to show the second prong. The second prong is a subjective test. *Trus Joist Corp.*, 735 P.2d at 134. Thus, Plaintiff must show that the insurance company committed "consciously unreasonable conduct." *Id.* "Consciously unreasonable conduct" requires that the insurance company either acted knowing it was acting unreasonably or acted with sufficiently reckless disregard of the fact that it did not have a reasonable basis for denying the claim that knowledge can be imputed to it. *Id.* In considering this second prong, this Court has noted:

> Generally, '[w]hile an insurer may challenge claims which are fairly debatable, . . . its belief in fair debatability 'is a question of fact to be determined by the jury.'' [*Zilisch*, 995 P.2d at] ¶ 20 (quoting *Sparks v. Rep. Nat'l Life Ins. Co.*, 647 P.2d 1127, 1137 (Ariz. 1982)). If the plaintiff offers no significantly probative evidence that calls into question the defendant's belief in fair debatability, however, the court may rule on the issue as matter of law. *See Knoell v. Metro. Life Ins. Co.*, 163 F. Supp. 2d 1072, 1077 (D. Ariz. 2001) ('[B]ecause there are no questions of fact to present to a jury about whether the insurance company really believed it should investigate the claim verses just using the investigation as a pretext to avoid payment, this Court concludes that the Defendant did not act in bad faith by investigating the claim.').

*Young v. Allstate*, 296 F.Supp.2d 1111, 1116 (D. Ariz. 2003).

1   Finally, even if the insurance company can show "fair debatability" and that its
2   actions were objectively and subjectively reasonable in denying a claim, it still might be
3   liable for bad faith based on its actions during the claims handling process.  In other words,
4   even if as a result of a claim being fairly debatable Defendant is not liable for bad faith for
5   failing to pay the claim, Defendant might still be liable for bad faith if Defendant was
6   unreasonable in processing the claim. *See Zilisch v. State Farm Mutual Automobile*
7   *Insurance Co.*, 995 P.2d 276, 280 ¶ 22 (Ariz. 2000) ("as we have held, while fair debatability
8   is a necessary condition to avoid a claim of bad faith, it is not always a sufficient one").[3]

9   In this case, Plaintiff offers the following as evidence of Defendants' alleged bad
10  faith.  Defendants reply as indicated below.

11  First, Plaintiff argues that the medical evidence uniformly supported continuing
12  benefits, and Defendants have offered no medical opinion to the contrary; thus, Defendants
13  were in bad faith to discontinue benefits in April 2001.

14  Defendants reply and do not dispute that they do not have their own medical evidence.
15  However, they argue that Dr. Cornelius did not disagree with the termination of benefits.
16  The Court finds a disputed issue of fact as to how to interpret Dr. Cornelius' comments and
17  notes as to whether Plaintiff was still suffering from a full disability, a partial disability, or
18  no disability as of April 2001 and thereafter.

19  Second, Plaintiff argues that Defendants: A) did not contact the treating physician
20  before denying benefits; B) disregarded Defendants' own consultant's recommendation to
21  conduct a medical review; C) failed to conduct an independent medical examination after the
22  denial of benefits; and D) failed to consult with any physician regarding the medical records;
23  thus, Plaintiff claims, Defendants were in bad faith in the way they conducted their
24  investigation.

---

[3] *But see Lasma Corp. v. Monarch Ins. Co.*, 764 P.2d 1118, 1122 (Ariz. 1988) ("the tort [of bad faith] will not lie for claims which are 'fairly debatable'").

- 6 -

Defendants do not reply to the first two of these allegations. The Court will presume, for purposes of this Order only, that these two allegations are true. With respect to the third and fourth allegations, Defendants agree that they did not conduct an independent medical examination or consult a physician, both of which they state were unnecessary, because they did not dispute Dr. Cornelius' reports.

Third, Plaintiff argues that post-denial of benefits Defendants: A) failed to discuss with Dr. Cornelius what he meant by a "trial" of work (presumably meaning that Plaintiff could potentially receive partial disability benefits); and B) Defendants failed to follow-up with Dr. Barranco regarding Plaintiff's cervical condition; thus, Plaintiff claims this shows Defendants knew they did not have a basis for their denial of Plaintiff's claim.

Defendants reply and agree that they did not follow-up with Dr. Cornelius on what he meant by a trial of work. They state that Dr. Cornelius admits that he meant Plaintiff should try a gradual return to work. Thus, the Court concludes that Defendants terminated benefits at a time the only examining or treating physician said Plaintiff could attempt some level of partial return to work.

Next, Defendants state that they did not have to follow-up with Dr. Barranco (regarding the neck condition) because Plaintiff was not under his "regular care," as required by the policy. As some point, after April 2001, Plaintiff's neck condition became so bad that it required surgery. The Court is unclear when, and to what extent, Plaintiff disclosed the gravity of this condition to Defendants. However, it would seem that a reasonable fact finder could determine that at least at the point of surgery Plaintiff was under the "regular care" of a physician. Therefore, the Court finds a disputed issue of fact as to the extent of Defendant's knowledge and duties with respect to the neck condition.

Fourth, Plaintiff claims that Defendants falsely documented Plaintiff's file when Cheryl Eder (a claims analyst for Defendants) wrote that Dr. Cornelius told Ms. Eder that Plaintiff was "stable" when, in fact, Dr. Cornelius told Ms. Eder that Plaintiff was "not stable." (*See* Plaintiff's Statement of Facts, Ex. 1, pg. 99 Cornelius Deposition; and Defendant's Statement of Facts, Paragraph 66.) Additionally, Plaintiff claims that

- 7 -

1   Defendants mislead Plaintiff by telling him that his policy required that his disability be a
2   "direct" result of illness, when, in fact, the policy contained no requirement. Finally, Plaintiff
3   vaguely claims that Defendants "made misleading statements in correspondence" and
4   "omitted key facts in their denial letter."

5   With respect to whether Ms. Eder made incorrect and/or fraudulent notes about her
6   conversation with Dr. Cornelius, the Court finds a disputed issue of fact.[4]  Defendant does
7   not respond to Plaintiff's allegation that Defendant incorrectly told Plaintiff that his disability
8   had to be directly from illness; therefore for purposes of this Order only, the Court will
9   assume this allegation is true.

10   Fifth, Plaintiff claims that as a matter of law Defendants engage in "unreasonable,
11   oppressive, and outrageous conduct" and that they denied Plaintiff's claim "pursuant to an
12   illegal scheme that targeted high-income own-occ policies exactly like [Plaintiff's policy]."
13   *Citing Hangarter v. Paul Revere Life Ins. Co.*, 236 F. Supp. 2d 1069, 1083-1086 (N.D. Cal.
14   2002) *aff'd in part, rev'd in part, Hangarter v. Provident Life and Accident Ins. Co.*, 373
15   F.3d 998 (9th Cir. 2004). Further, Plaintiff claims that he was in the exact class of "psych
16   claims" which were targeted by Defendants with an arbitrary limit set on the number of these
17   types of claims that had to be terminated per month. Thus, Plaintiff claims this evidence
18   shows a conscious course of conduct to deny his claim.

19   Defendants reply does not dispute the substance of what Plaintiff claims the California
20   court held. However, Defendants argue that for this type of institution bad faith cannot be
21   used against them in every case. Instead, each Plaintiff must show a nexus between the
22   insurance companies' alleged inappropriate claims practices and the denial of this particular
23   Plaintiff's claim.

---

25   [4] More specifically, Dr. Cornelius says he said Plaintiff, "was improving but not
26   stable completely." Defendants then argue that Dr. Cornelius did not say Plaintiff was "not stable." Regardless of whether Defendants have accurately identified a distinction in syntax,
27   Ms. Eder's notes state that Dr. Cornelius said Plaintiff was "stable," which is contradicted by Dr. Cornelius' deposition testimony wherein he claims he said Plaintiff was, "not stable
28   completely."

- 8 -

1    The Court agrees that each Plaintiff must show a nexus between the inappropriate 2 claims practices and the denial of this particular Plaintiff's claim.  In this case, Plaintiff has 3 attempted to show this nexus by arguing that both the type of policy ("high-income own-occ 4 policies") and the type of claim ("psych claim") are exactly the areas these inappropriate 5 claims practices targeted.  Specifically, Plaintiff argues that Defendant admitted that it 6 targeted psych claims because there is a "gray" area where there would be a greater ability 7 to "recognize denials."  The Court finds that this is sufficient evidence to create a question 8 of fact as to whether the allegedly inappropriate claims practices affected the processing of 9 Plaintiff's claim and therefore, the Court will consider this evidence on the question of 10 whether there is sufficient evidence of bad faith (and behavior to support a punitive damages 11 claim), to create a question for the finder of fact.

12    In this case, with respect to Plaintiff's bad faith claim based on a failure to pay 13 benefits theory, the Court finds the following evidence creates a question of fact on the 14 objective prong of the bad faith analysis:

15 • The disputed issue of fact as to how to interpret Dr. Cornelius' (who represents
16   the <u>only</u> medical opinion at the time of termination) comments and notes as to
17   whether Plaintiff was still suffering from a full disability, a partial disability,
18   or no disability as of April 2001 and thereafter;

19 • Defendants did not contact the treating (and only) physician before denying
20   benefits;

21 • Defendants disregarded Defendants' own consultant's recommendation to
22   conduct a medical review;

23 • Defendants terminated all benefits at a time the only examining or treating
24   physician said Plaintiff could attempt some level of partial return to work
25   ("trial" of work);

26 • The disputed issue of fact as to the extent of Defendant's knowledge and
27   duties with respect to the neck condition.

- 9 -

With respect to Plaintiff's bad faith claim based on a failure to pay benefits theory, the Court finds the following evidence creates a question of fact on the subjective prong of the bad faith analysis:

- The disputed issue of fact regarding whether Ms. Eder made incorrect and/or fraudulent notes about her conversation with Dr. Cornelius;
- Plaintiff's allegation that Defendants incorrectly told Plaintiff that his disability had to be directly from illness.

With respect to Plaintiff's bad faith claim based on "bad faith" in claim processing, the Court finds the following evidence creates a question of fact on whether Plaintiff's claim was processed unreasonably:

- Defendants did not contact the treating (and only) physician before denying benefits;
- Defendants disregarded Defendants' own consultant's recommendation to conduct a medical review;
- Plaintiff has the type of policy ("high-income own-occ policy") targeted by the allegedly inappropriate claims practices;
- Plaintiff had the type of claim ("psych claim") targeted by the allegedly inappropriate claims practices and Defendant admitted that it targeted psych claims because this is a "gray" area where there would be a greater ability to "recognize denials."

Accordingly, Defendants' Motion for Summary Judgment on all of Plaintiff's theories of bad faith will be denied.

**PUNITIVE DAMAGES**

To recover for punitive damages, Plaintiff must show something more than the conduct required to state a claim for bad faith. *Rawlings v. Apodaca*, 726 P.2d 565, 577-78 (Ariz. 1986). The something more that must be shown is evidence that Defendant was aware of and consciously disregarded a substantial and unjustified risk that significant harm would occur. *Id*. at 578 ("indifference to facts or failure to investigate are sufficient to establish

1  the tort of bad faith but may not rise to the level required by the punitive damages rule"). 
2  Said another way, to be liable for punitive damages, Plaintiff must prove, "1) evil actions; 
3  2) spiteful motives; or 3) outrageous, oppressive, or intolerable conduct that creates a 
4  substantial risk of tremendous harm to others." *Volz v. Coleman Co.*, 748 P.2d 1191, 1194 
5  (Ariz. 1987). The Arizona courts have also articulated this test as requiring that Defendant 
6  engaged in outrageous, aggravated, malicious, or fraudulent conduct. *See Rawlings*, 726 
7  P.2d at 578.

8  Defendants correctly argue that punitive damages require "something more" than what 
9  would be required for a bad faith claim. However, the same evidence of outrageous or 
10 fraudulent conduct can support a claim for both bad faith and punitive damages.

11 In this case, the Court has found a disputed issue of fact as to whether Ms. Eder made 
12 incorrect and/or fraudulent notes about her conversation with Dr. Cornelius (regarding 
13 whether Plaintiff was "stable") and Plaintiff has alleged that Defendants intentionally, 
14 incorrectly told Plaintiff that his disability had to be directly from illness, which was not 
15 required under the policy. The Court finds that this evidence creates a question of fact for 
16 the jury on whether Defendants intentionally committed fraud in denying benefits, which 
17 could support a punitive damages award. *See Rawlings*, 726 P.2d at 578.

18 Additionally, the Court finds that Plaintiff's evidence that Defendants targeted high-
19 income policies and psychological claims, with specifically required monthly terminations 
20 of claims, creates a question of fact as to whether Defendants engaged in intentionally 
21 outrageous conduct. Thus, a finder of fact could find such conduct to be sufficiently 
22 outrageous, and likely to cause a substantial risk of harm by depriving someone of possibly 
23 his or her sole source of income, that the finder of fact could award punitive damages. *See* 
24 *Volz*, 748 P.2d at 1194.

25 / / /
26 / / /
27 / / /
28 / / /

**CONCLUSION**

Based on the foregoing,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. #77) is denied in its entirety.

DATED this 26th day of September, 2005.

_____
James A. Teilborg
United States District Judge